FLOYD A. AND JOANNA R. TOUPS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toups v. Commissioner
Docket No. 7630-92
United States Tax Court
T.C. Memo 1993-359; 1993 Tax Ct. Memo LEXIS 368; 66 T.C.M. (CCH) 370; August 16, 1993, Filed *368 Decision will be entered under Rule 155. Floyd A. Toups, pro se. For respondent: Emile L. Hebert, III. COUVILLION
COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) [1] and Rules 180, 181, and 182. Respondent determined deficiencies of $ 3,402, $ 4,738.50, and $ 4,181 in petitioners' Federal income taxes for 1988, 1989, and 1990, respectively. The parties have settled all adjustments in the notice of deficiency by stipulation. The sole issue for decision is whether losses sustained by petitioners in the operation of a rental real estate activity constitute passive activity losses under section 469(a). [2]
*369 Some of the facts were stipulated, and those facts, with the annexed exhibits, are made part hereof by reference. Petitioners were residents of the State of Louisiana at the time they filed their petition. Their home is at Baton Rouge. Floyd A. Toups (petitioner) is an engineer and, for 27 years, has been employed by Rubicon, Inc., at a chemical plant at Geismar, Louisiana, a few miles south of Baton Rouge. During the years in question, petitioner was the production engineering manager at this plant, responsible for what he described as "site maintenance" and "production management". He was employed on a full-time basis. In late 1984 and early 1985, petitioners became interested in a real estate development offered by Callaway Gardens, at Pine Mountain, Georgia. Callaway Gardens is a vacation and convention resort area located approximately 70 miles south of Atlanta. The development consisted of the construction of 155 furnished houses, referred to as "cottages", on or near the grounds of Callaway Gardens to be rented for short-term periods to visitors and patrons of Callaway Gardens. Each cottage would be individually owned by an investor on land leased from Callaway Gardens. *370 The cottages would be managed and marketed by Callaway Gardens, with the income and expenses from all cottages pooled and shared ratably among the owners of other cottages, based upon the number of days each cottage was available for rent during the year. Callaway Gardens was paid a fee of 50 percent of net rental income for its services. Each cottage owner was entitled to rent-free use of his cottage for no more than 14 days during a calendar year, which limitation also covered use by his relatives and guests. The terms and conditions for the arrangement between cottage owners and Callaway Gardens were set out in rental management agreements between each cottage owner and Callaway Cottages, Inc. In these agreements, Callaway Cottages, Inc., agreed to serve as the owner's agent "for the rental, management, and maintenance of the Owner's Unit" and to serve "as the sole and exclusive agent to manage and offer for rental the Owner's Unit according to the terms, conditions, and covenants" of the agreements. The management agreements were for a period of 30 years, after which the cottage owners, as a group, could terminate each agreement. Under certain conditions not pertinent here, *371 Callaway Cottages, Inc., could elect to terminate the agreements within the 30-year period. Petitioners purchased one cottage in this program, making a cash downpayment in late 1984 and consummated the purchase in 1985. The cost for their cottage, furnished, was $ 120,000, and the amount owing in excess of their downpayment was independently financed by them through a bank loan. Their rental management agreement with Callaway Gardens, Inc., is dated April 19, 1985. Of the 155 cottages in the program, 110 were purchased by individual investors such as petitioners, and 45 cottages were retained by Callaway Gardens (or a subsidiary). The operations of the 45 units owned by Callaway Gardens were pooled with those of the investor-owned units. The parties agree that the average rental period, during the years in question, of petitioners' cottage was less than 7 days. See sec. 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). For the 3 years in question, petitioners reported the operations of their cottage as a trade or business activity on Schedule C of their Federal income tax returns. They reported net losses of $ *372 17,806, $ 18,250, and $ 10,792, respectively, for the 3 years. In the stipulation the parties agree that petitioners' net losses were $ 17,197, $ 20,414, and $ 10,792, respectively, in lieu of the amounts reported. During 1988 and 1989, petitioners owned a 50 percent interest in a commercial office building at Baton Rouge. During 1990, petitioners owned 100 percent of this building. The building was rented out during the 3 years in question. Petitioners reported this building activity as rental income on their Federal income tax returns for the 3 years on Schedule E, Supplemental Income Schedule. They reported net rental losses of $ 25,090, $ 18,358, and $ 24,116, respectively, for the 3 years at issue. The parties have stipulated these losses at $ 24,848, $ 16,156, and $ 30,244, respectively, in lieu of the amounts reported. Respondent determined that the losses sustained by petitioners in their cottage activity at Callaway Gardens were passive activity losses within the meaning of section 469(a), and, accordingly, petitioners are limited by section 469 as to the amount of losses which can be deducted by them for the 3 years at issue. Petitioners contend they materially *373 participated in the operation of their cottage, and, accordingly, their losses in this activity are not subject to section 469. The determinations of respondent in a notice of deficiency are presumed correct. The taxpayer bears the burden of proving that respondent's determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 469(a)(1) provides generally that any passive activity loss claimed by a subject taxpayer during any taxable year is not allowable as a deduction. Section 469(a)(2) includes as subject taxpayers, among others, any individual, estate, or trust. Section 469(d)(1) generally provides that the term "passive activity loss" means the amount, if any, by which (A) the aggregate losses from all passive activities for the taxable year exceed (B) the aggregate income from all passive activities for such year. Essentially, therefore, the general rule of section 469 is that deductions attributable to passive activities are allowed only to the extent of income of the taxpayer from all such activities. An exception to the general rule is provided in section 469(i). That provision allows a deduction of passive *374 activity loss in excess of passive activity income in any taxable year in an amount not to exceed $ 25,000 in the case of a natural person with respect to losses attributable to rental real estate activities in which the individual actively participated. This exception phases out, in certain circumstances, where the taxpayer's adjusted gross income exceeds $ 100,000. Sec. 469(i)(3). In this case, the parties agree that the rental losses sustained by petitioners in connection with their commercial office building at Baton Rouge, Louisiana, are allowable as deductions under the $ 25,000 offset of section 469(i). The parties, however, are not in agreement with respect to petitioners' losses sustained with respect to their cottage at Callaway Gardens. Further statutory and regulatory references become relevant at this point. Section 469(c) provides: (c) Passive Activity Defined. -- For purposes of this section -- (1) In general. -- The term "passive activity" means any activity -- (A) which involves the conduct of any trade or business, and (B) in which the taxpayer does not materially participate.
Section 469(c)(2) further provides that "passive activity" includes *375 any rental activity. Under section 469(c)(4), rental activity constitutes a passive activity without regard to whether or not the taxpayer materially participates in the activity. Under section 469(c)(6), to the extent provided by regulations, the term "trade or business" includes (A) any activity in connection with a trade or business, or (B) any activity with respect to which expenses are allowable as a deduction under section 212. Section 1.469-1T(e)(3)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), provides that an activity involving the use of tangible property is not a rental activity if, for a taxable year, the average period of customer use for such property is 7 days or less. In this case, respondent agrees that, since the average period of customer use of petitioners' Callaway Gardens cottage was 7 days or less during the years in question, petitioners' activity, with respect to this property, is not a rental activity. Thus, the activity is a trade or business activity. However, the activity, nevertheless, is a passive activity under section 469(c)(1) if the taxpayer does not "materially participate" in that activity. *376 Sec. 469(c)(1)(B). Petitioners contend that they materially participated in their Callaway Gardens cottage activity and, accordingly, satisfy the requirements of section 469(c)(1). Respondent disagrees with that contention. Section 469(h) provides: (h) Material Participation Defined. -- For purposes of this section -- (1) In general. -- A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operation of the activity on a basis which is -- (A) regular, (B) continuous, and (C) substantial.
Section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), describes 7 alternative factual situations where an individual shall be treated, for purposes of section 469, as materially participating in an activity. Petitioners rely on alternative 3 of this regulation, which provides that there is material participation in an activity if: The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual *377 (including individuals who are not owners of interests in the activity) for such year;
Petitioners contend that approximately 341 hours each year were devoted to their cottage and submitted to the Court an outline of 13 specific activities they performed which they contend constitute "material participation" in the operation of their cottage. These activities consisted of: (1) Providing funds for purchase of the cottage; (2) preparing an annual budget with respect to their cottage; (3) preparing a cash flow analysis; (4) providing a rental agency for the rental of their unit under the pooling arrangement with other cottage owners; (5) marketing Callaway Gardens and rental of their cottage; (6) meeting with the other cottage owners; (7) establishing rental rates for the cottages with the other owners; (8) inspecting the cottage and common areas at least twice a year; (9) reviewing monthly reports received from the rental agent, Callaway Cottages, Inc.; (10) reviewing other correspondence from the rental agent; (11) reviewing advertising brochures about Callaway Gardens received from the rental agent; (12) receiving and depositing net revenues received from rental of their cottage; *378 and (13) issuing checks for pooled expenses of the cottage. The Court holds that the activities conducted by petitioners are not activities which constitute material participation in their cottage activity for purposes of section 469 and the regulations. Section 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides generally that work done by an individual in an activity in his capacity as an investor shall not be treated as participation in the activity unless the individual is directly involved in the day-to-day management or operations of the activity. Moreover, section 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5686 (Feb. 25, 1988), provides further that studying and reviewing financial statements or reports on operations of the activity, preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use, and monitoring the finances or operations of the activity in a nonmanagerial capacity, constitute activities which are considered as work done by an individual in his capacity as an investor. Virtually all of *379 the work described by petitioners related to their investment. Petitioners were not involved in the day-to-day operations of their cottage and were not involved in its management. All of the financial work they did was in connection with their investment. Moreover, a considerable portion of the hours claimed by petitioners occurred during the 14 days they spent each year on vacation at their cottage. Whatever business they conducted at that time which could remotely be considered as related to the cottage was incidental to the primary purpose of their visit, vacation. Petitioners also considered as "cottage activity" the driving time from Baton Rouge, Louisiana, to Pine Mountain, Georgia. The driving time, one way, is 8 hours. Petitioners considered each way as 16 hours because both spouses were involved. Thus, 32 hours of the 341 hours claimed represented travel time. Petitioners contend that a considerable portion of time consisted of marketing and promoting Callaway Gardens and their cottage. Petitioners agreed they incurred no expenses in this regard, and their promotion and marketing activities consisted of discussions with friends, neighbors, and guests, either at *380 home or at their country club at Baton Rouge, or with petitioner's co-workers at his place of employment. The Court does not view these activities as any serious marketing or promotion activity. The Court has also considered the fact that petitioners, in addition to their 14-day vacation, also visited Callaway Gardens each year for a homeowners' meeting. Prior to 1988, such meetings were not held, and, it appears from the record, that these annual meetings commenced in 1988, after the firm of certified public accountants representing the development advised the homeowners and Callaway Gardens of the enactment of section 469 by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, and that questions could be raised by the Internal Revenue Service that losses sustained by cottage owners would be subject to the passive loss limitations of section 469. The annual meetings were suggested, along with other recommendations, to show material participation. The Court finds that the recommendations suggested are superficial and do not materially change the operations or management of the cottages. Section 1.469-5T(f)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5726-5727 *381 (Feb. 25, 1988), provides, among other things, that work done in connection with an activity shall not be treated as participation for purposes of section 469 if the work is not of a type that is customarily done by an owner of such an activity, and one of the principal purposes of the work is to avoid the disallowance of the loss under section 469. Petitioners' evidence, therefore, in general falls short in satisfying this Court that they were involved in the operation of their activity on a basis which was regular, continuous, and substantial within the intent and meaning of section 469(h)(1) and the regulations. On this record, therefore, the Court concludes that petitioners have not sustained their burden of establishing that they were material participants in their Callaway Gardens cottage activity. Accordingly, respondent's determination that their losses for the 3 years in question were passive activity losses under section 469 is sustained. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. As a result of the parties' stipulated settlement of the other issues, a Rule 155 computation will be necessary irrespective of how the Court decides the section 469 issue. One other adjustment in the notice of deficiency, a $ 354 disallowance of Schedule A, miscellaneous itemized deductions, is a computational adjustment which will be resolved by the agreed issues and the Court's holding on the contested issue.↩